Our third case for this morning is Gregory Wilson v. Wexford Health Sources, Mr. Kalidarchi. May it please the court, I wanted to emphasize three sort of salient things that occurred to me after reviewing my notes and the briefs. This would have been a different case at trial were it not dismissed or the respondeat count not dismissed early on. There is a whole different tenor to a case under respondeat than policies and procedures. There's a lot more to prove at trial. Secondly, the notion that the motions for directed verdict somehow moot questions about the respondeat superior case I think is ill-founded in the law of res judicata in Illinois. Can I just comment? You are more than welcome, at least from my point of view, to preserve any argument you want for the Supreme Court and that's what you're doing with your it's above our pay grade to change that particular rule, even if we were inclined to do it. Secondly, although there's the second tier argument about private companies that our court has alluded to both in majority and separate opinions, it doesn't seem really to be raised here either and just last week or a couple weeks ago maybe, what's today, the 10th, all right, so 12 days ago in the Gaston against Gosch case, we once again said, look, maybe there's a case somewhere to see if private companies should have a different rule but this isn't the case to do it. That's what we said in Gaston and why isn't that also true here? Because I believe Judge Easterbrook erred in part. Well, let's assume he didn't just for the moment. That's why I raised the first point because I was criticized in that case for not having conducted discovery on the respondeat superior theory. How? It was dismissed at the pleading stage and never answered the complaint. I had no opportunity to pursue a respondeat superior theory. But to the extent you're asking for that discovery to try to overturn Monell, as Judge Wood said, that's up to the Supreme Court. That's not up to us. Well, that's not how I would exactly phrase it. My point about Monell is A, it doesn't involve a private company. So you really want us to overturn our own earlier decision. That's your authority, correct. That's right, which we certainly could do if we were so inclined in the Iskander case. But the ink is hardly dry on the Gaston case. I understand the point you're making. At the 12B6 stage, discovery hasn't happened yet. But this is not a situation where that's a problem, at least. And Judge Hamilton has some interesting comments. He concurs, by the way. He's the one who's been carrying the burden on this discussion. But he doesn't see even Gaston as a case where the underlying employees have done anything wrong, that there would be anything to attribute to the Wexford people in this instance. Again, I think that my sense of reading that opinion is that it came down on a misapprehension of the stage, at which it came to the court. I mean, in that case, and again, I have a bathtub sort of memory here, so I've drained Gaston from my consciousness. The suggestion was, well, you haven't proved an individual person was accountable for this two-week delay in getting the treatment. Yes. But the point I made in oral argument there that didn't seem to make it into the opinion was, in a defective manufacturing case, should I sue the autoworker on the line, or even identify it, who failed to tighten the bolt down that loosened the steering wheel? No. That's not how respondeat superior has worked for 200 years. What is it about this case? I don't think you can use this case as a motion to reconsider the Gatson case. Well, I was asked about Gaston. I understand. What is it about this case that you think makes it right to overrule the precedent here, starting from Iskander and above? Shields and Gaston all talk about why those cases weren't appropriate ones. Why is this appropriate? Well, I think that my theory is the same in both. I would grant you that. But I also think that there is the notion of corporate personality that is being articulated in the Supreme Court. We talked about the political rights of corporations to express themselves politically. You have the right that they have to exercise religion. Well, this is a little bit broad for me, so I want to go back to a question. Normally, if you're thinking of respondeat superior, you actually have to show the initial wrongdoing. Here, Williams, Obayishi, somebody else has done something wrong, and then it's attributed to the employer. We do this all the time in Title VII cases, right? The supervisor discriminates, and so the company is responsible for the supervisor's discriminatory behavior, whatever version of discrimination has happened. In this case, I think Judge Coleman got to the point of saying, Mr. Wilson isn't a doctor. He doesn't know how to treat these particular kinds of hernias. He said he was in pain. They came back and said, we exercised our medical judgment and handled it in a certain way, and he doesn't really have anything to come back with. So if nothing went wrong, then why do we even care about Wexford in this case? Well, I guess the most glaring example to me is the fact that Wexford had a practice of shredding medical requests if they weren't going to be granted 376 of the record. Why does that help us decide Mr. Wilson's case? Because he submitted and testified that he submitted them regularly and routinely, and they appear nowhere in his medical record. I don't know personally who shredded those. It was certainly a Wexford employee or maybe several, and if that's important that there was nothing in the record to indicate that he'd been complaining about this hernia, then Wexford shred the ones they weren't going to grant because they weren't going to allow that treatment. That was their policy. The direct answer to your question about why is Wilson different so much than Gaston, I believe the arguments are the same, and I wouldn't insult your judgment on that. I do think they are essentially the same. I just disagree with Gaston. I think they got turned on a discovery issue. And I'm trying to ask you, even if we agreed with you, even if we overruled Iskander, why is this a case in which Wexford would be liable on a respondeat superior basis if the underlying physicians were acting in a way that certainly does not display deliberate indifference? It may not even reach the level of medical malpractice. Apparently there are differences of opinion in the way one treats hernias. Well, yeah, the differences of opinion might be meaningful or not. Well, there's some assessment of whether it's a small, I mean, there are medical records that indicate this was a rather small one and immediate surgery isn't indicated. Obviously, Mr. Wilson thought he did need surgery, but he wasn't the doctor. So I guess I want to know, even if you were to prevail on the respondeat superior argument, why that takes you the next step down the road and says Wexford is responsible for something. If the underlying people didn't do anything that met the Eighth Amendment standard, then why did Wexford? Judge Hamilton in his concurrence describes the three circumstances of corporate liability. And which one do you think you're in? The third, which is the one that I talked about where I'm talking about corporal personality. Collective indifference. I think even if Obese and Williams were negligent and they were serially negligent over years. Which is not enough for the Eighth Amendment. There are cases that hold that you don't have to prove the underlying, the actor's negligence if the employer knows it's going to happen and expects them to be negligent. You need to get to deliberate indifference is what you're saying, which is true. Right. So that is sort of the milieu that I'm trying to describe and try to answer your question. But that is the area, and I acknowledge that there is a dispute. There are academic disputes. I have always in my practice, and I'm a tort lawyer, understood corporate reality to be the actions of the agents and the employees and that that's their state of mind. And it can, it seems to me, rise to a level of deliberate indifference over time. Have I answered your question as much as I can? I think so. I mean, it sounds to me, I mean, I'm looking at the language Judge Hamilton used, but when we see these cases, I mean, this is Mr. Wilson's case fundamentally. We need to find somebody did something wrong. In other words, and the wrong has to be measured by the appropriate legal standard, which here is an Eighth Amendment standard. I would say. And now it's Eighth Amendment. Okay. I would say that his report in January of 2012, that he had a hernia and that it was painful. 2013. 2013. Thank you. I think it onset earlier. I get confused. And the surgery taking two and a half years, and there's really no dispute. Dr. Giamatti said, you know, these are patients with hernias. No matter how big, if they're painful, we recommend surgery. That's part of the record. That that time period in itself and by itself is at least a colorable case, as a matter of fact, under respondeat superior for me to argue to a jury. How do you get around the testimony from the independent doctor who was at UIC? Putting aside Dr. Obese's, but the independent doctor, who when he saw him and conducted the surgery later on said that it wasn't urgent. It was never urgent. And urgent surgery wasn't required. Urgent means it's become incarcerated, no pun intended. It was painful from the onset. And the fact that it is urgent only means clinically it's gotten closer to a disaster. And I wouldn't argue that that was true here. I mean, he was jamming it back in his guts, back in his abdomen daily, painfully. But the deliberate indifference standard is pertinent to his pain that occurred. And I medically would not dispute that it was urgent or emergent. Because clinically I think the science is fairly clear that an incarcerated hernia is an urgent one and a strangulated hernia is an emergent one. Emergency, right. But the point is over this much time. Now you're relying on the line of cases that say lengthy, untreated periods of pain themselves can call for action. Yes. Okay. So maybe you want to save a little rebuttal time. It's up to you. I'm sorry. It's in your rebuttal time. So if you would like to reserve that. Oh, I am. I'm sorry. No, I will save time. Thank you. Okay. Mr. Hulting. Good morning, Your Honors. May it please the Court. I'd just like to briefly start by clarifying something that counsel addressed about the practice of shredding medical records. There is no evidence on the record of this. And further, as to the allegedly submitted records, Mr. Wilson at trial admitted that he did not know if Dr. Obese or Ms. Williams ever received or saw these letters. During trial and during depositions, counsel asked each witness if they knew of a practice of Wexford to shred or to not report on issues that they couldn't or wouldn't treat. Every single witness denied this outright. There's not one shred of evidence that things were shredded or ignored because of a Wexford policy or practice as plaintiff alleges. No evidence of some corporate-wide document retention policy, which actually many companies maintain? There's evidence of how they retain documents, but nothing . . . the way that plaintiff has presented . . . I mean, you could say, for example, we keep documents five years back or something. That's not part of this record, so I couldn't give you a proper answer. Okay. Dr. Obese . . . . . . as to the January 2013 time period. There was a lot of focus on from February forward, February 2014 forward. And when he finally saw Dr. Obese, when he had previously seen Ms. Williams, but did she address why she was granting directed verdict as to the original complaint to Dr. Obese that plaintiff claims he made? I understand Dr. Obese disputes it, but this is a directed verdict. Did she address this? She addressed the January 10, 2013 appointment. What was the basis of granting directed verdict on that earlier time period? So I think there's two responses to that. One, as to that appointment, and counsel will characterize this as a difference in opinion, the records show that the reason he was seen on January 10, 2013 was in response to a November letter that Mr. Wilson sent to Dr. Obese. I understand the documentary evidence doesn't necessarily support what he testified to, but looking at the trial testimony, it was pretty clear the plaintiff said he told Dr. Obese about his hernia in January of 2013. And so my question is when the district court granted the directed verdict, did the court address why the directed verdict was appropriate from that January 2000 period up until the 2014 period, which she did address at that point. I think the same argument applies as to why it was appropriate from the first time he was seen by Ms. Williams. The watchful waiting approach for a small, reducible inguinal hernia was accepted by every medical professional in this suit. Regardless of pain, though? I mean, the funny thing about the district court's action is that this isn't a 12 v. 6 situation. There's a jury. Everything's going on. Why not, in light of what appears to be a conflict in the testimony, just send it to the jury, see what they say? I mean, he says he told Dr. Obese. He says he was in constant pain. Maybe it was a physically small inguinal hernia, but if he's in constant pain because of it, does that mean Wexford gets to sit by and say, tough luck, life is hard? I mean, that's not the standard. No, and Judge Coleman does address the pain in her directed verdict. She says that Mr. Wilson mentioned pain, but he never discussed the extent of the pain. That's one of her reasons for granting the directed verdict. So what are people supposed to do? Go give some dramatic performance about how much pain they're in? It's not enough to say you would. I would. Maybe so. Some people are stoic. The testimony and the records and all of the complaints of Mr. Wilson don't show that he ever actually had these complaints. There's numerous complaints, letters and grievances. But he testifies that he was in pain. That's testimony. It's a direct personal account. There's nothing wrong with that as a piece of evidence. True. So if this had gone to the jury, that would be your argument. But it didn't go to the jury. The directed verdict was granted without anybody making that determination about his testimony regarding January of 2013. Right. There was also testimony from Dr. Gangemi as to his pain. He said that the only pain he felt when he reported to him was pain during weightlifting. He didn't say that he was in pain every day and pushing his guts back into his abdomen, as counsel has referenced. The testimony based on Dr. Gangemi's records and his testimony at trial was that he had pain when he was weightlifting, but it was otherwise asymptomatic. Why isn't that just impeachment evidence? If he testifies I was in extreme pain, then it would seem to me perfectly appropriate impeachment evidence to come back and say, you know what, but our contemporaneous records don't show you conveying that problem to the relevant doctors and everything. So, ladies and gentlemen of the jury, we think he's exaggerating. This court has previously held that when the testimony of a party is so blatantly contradicted by the records in a deliberate and indifferent standard, it can be ignored. I think you vastly overstated what we've said, certainly when it comes to a personal report of pain. And again, at the directed verdict stage. It may be in viewing the evidence at the light most favorable after a trial, but at the directed verdict stage, how can we do that? This case that I referenced was at the summary judgment stage, so it would have the same or similar standard required of the court. But this isn't a Scott versus Harris situation where you've got the video of the high-speed chase or something of the sort. This is a person reporting pain. And as you are pointing out, there's impeachment evidence in the record. Maybe it was not constant. Maybe it wasn't as unbearable as he says. I don't know how much pain people are supposed to live in that goes unredressed, but let's assume there's some threshold. But I don't know why that's not something that one resolves through the jury. Again, Your Honor, I think it goes back to the testimony of all the parties and the acceptance. Except him. Right? Yes, and the acceptance of the approach of watchful waiting by the medical community for a small, reducible left inguinal hernia. Yeah, what's missing in that story? I'm not actually as concerned about when did the surgery take place. Maybe that wasn't the right intervention. There are all kinds of things. This is us years upon years of looking at medical things. There are pressure belts that people can wear that help with hernias. There are other things or treatments that can be done if somebody's in pain. Is it your view that if it doesn't require surgical intervention, you just say to them, too bad, you're in pain? No, and I don't believe the record shows that that was the case here. When Ms. Williams saw Mr. Wilson on February 21, 2012, she notes that was the first time the inguinal hernia was discovered. But now we're a year later, though. Yes, but going back to her treatment, Ms. Williams did note that she gave him information on how to treat it. He was also receiving pain medication during this time. There's a number of letters that he sends where he requests medication unrelated to this for claritin and nasal spray, but he also is requesting pain medication, and it shows that he did receive the pain medication at this time. He was receiving pain medication throughout the duration of this, whenever in January 2011, certainly as early as... And his testimony is it wasn't working, right? True. His testimony is that he was in pain, yes. Right, right. So in other words, whatever they were giving him wasn't doing the job. In his, yes. And was there evidence that he was receiving the medication in January of 2013? Yes. I know there was evidence back in 2012 when he saw Ms. Williams and then subsequently, but was there evidence to support that time period? I believe so, yes. From the time of the 2012, when he saw Ms. Williams, throughout the time until he had surgery, he was receiving pain medication. As to Dr. Obese, the record shows that as soon as he learned of plaintiff's hernia, he acted immediately. Dr. Obese learned of the hernia on February 27th, 2014. Four days later, on March 3rd, 2014, he examined Mr. Wilson, again noted the small, reducible left inguinal hernia, and referred him out to collegial review on March 10th. Seven days later, he was approved by collegial review for a surgical consultation. Ten days after that, on March 27th, he was set to be seen at Silver Cross Hospital by a surgical consultant. And they have this appointment date or hour problem, right? Yeah, and plaintiff has admitted that he does not attribute any of that delay to Wexford, Dr. Obese, or Ms. Williams. He was then referred to the University of Illinois, Chicago, where he saw Dr. Gangemi on August 1st, 2014. Dr. Gangemi noted, again, that it was a small, reducible, barely visible asymptomatic hernia. He noted that this hernia was not an urgent condition, it was not emergent, and then scheduled him for surgery. There was, again, a delay in the surgery, but Dr. Gangemi states that based on the nature of this hernia, any delay did not impact his condition in any way. He also noted that at the time of surgery, the hernia was still reducible. It was not incarcerated, it was not strangulated. For that reason, we ask that you affirm the decision in favor of Dr. Obese. As to Ms. Williams, the record is clear. She saw him once for his hernia on February 21st, 2012. She employed, based on her medical judgment, the watchful waiting approach. She provided him with information in terms of how to take care of a reducible hernia, and she never saw him again for his hernia after that. Her medical judgment of the watchful waiting was supported by Dr. Obese, by Dr. Gangemi, and all the other, and this court, in Anderson v. Robert Bales, that the watchful waiting approach is appropriate in a reducible hernia. The question here for these two individuals is, were Dr. Obese and or Ms. Williams deliberately indifferent to an excessive risk of harm to Mr. Wilson's health? And the answer here is no. Did Dr. Obese and or Ms. Williams subject Mr. Wilson to cruel and unusual punishment? Again, the answer here is no. As to Wexford, there was no policy or practice of Wexford that deprived plaintiff of his constitutional rights. First, we note, because neither Dr. Obese or Ms. Williams were deliberately indifferent, there is no constitutional deprivation, and therefore no Wexford policy could have caused a deprivation. Under Monell, plaintiff must show that an official policy or practice of Wexford was the, quote, moving force behind a deprivation of his constitutional rights. There is a guideline as to the treatment of abdominal wall and inguinal hernias that has been referenced in this case. We note that the guidelines state that the patients are to be evaluated on a case-by-case basis, and that, in general, patients with a reducible hernia are not candidates for surgery. But, again, this is evaluated on a case-by-case basis. Can you define reducible? Does that mean you're poking it back in? Yes, essentially. Okay. I believe the testimony was that— It seems rather unpleasant to me, but anyway. I've never had one. I couldn't tell you. And then, going further, the testimony of Ms. Williams and Dr. Obese shows that Wexford's policies weren't even considered in the treatment of Mr. Wilson. Dr. Obese, first off, sent him out for treatment. As soon as he found out about the inguinal hernia, he referred him for surgical consult. Sent him to collegial and then had the surgical consult. Dr. Obese noted in his testimony that, ever since he came to Stateville, it's been in his practice to send almost every patient with a reducible hernia out for surgery. He estimates in the calendar year 2014, he sent somewhere between 14 and 20 patients out. The only one he didn't send was an inmate who refused to have the surgery. Ms. Williams testified that she didn't know about the policies until she was presented with them, but she also testified that she treats patients, not paper. Her opinion was LaTanya Williams, medical judgment. For that reason, we ask that you find that no Wexford policy or practice violated plaintiff's constitutional rights. As to Dr. Carter, the district court properly dismissed the case against Dr. Carter based on a violation of the statute of limitations. He leaves the picture pretty soon, right? Yes, yes, he was dismissed rather early. First, it's important to note that the Illinois statute of limitations and tolling rules that are applicable to personal injury claims apply to this case based on DevGro versus Calou. Dr. Carter left Stateville in May of 2012. Any claims against them began tolling at that time because he could no longer affect plaintiff's treatment. Right. The Illinois stating statute provides for four types of extension or four types of dismissal that allow extensions. None of those are applicable here. This case was dismissed on July. The first case was dismissed on July 7th, 2016 for failure to exhaust administrative remedies. It was refiled on August 30th, 2016, almost four and a half years after Dr. Carter left Stateville. Lastly, we ask that you find that the district court properly granted defendant's motion eliminating number five, barring the reference to vicarious liability for Wexford. As this court noted in the shield, there is a unified phalanx of law throughout the country and through the Supreme Court that shows that their responding as superior is not applicable in 1983 claims. All right. Well, thank you very much, Mr. Holting. Thank you. Anything further, Mr. Kaldarchi? A lot, but I'm running out of time. You're going to have to squeeze it into two minutes. Thank you. I would just say that add case is Justice Harlan, and I suppose it's dicta, says that of course responding at superior theories of liability apply in 1983 cases. She took it for granted. The only time that the Supreme Court, and the Lugar case is the other one, the only time the Supreme Court has ever considered whether private corporations are liable in responding at superior, they have said that it was. Monel is a municipal corporation, and I would argue because it's infirm, it's unfair or inappropriate to extend it to private corporations. The question about whether there was shredding of documents by Wexford employees, I just don't mean to rebut counsel. If you look at the record at 376 to 380, Nurse Lutke testifies that there was. And that explains what happened to the medical requests. And I would urge you to look in terms of those are admitted evidence that Mr. Wilson's contemporaneous complaints of pain regarding his hernia are fairly wrenching. It was sufficient, I think, to establish pain in that case. And finally, if it was a reducible, tiny hernia when Gengame saw it, then why did he recommend surgery? I mean, that's the whole point. It was painful, and Gengame's practice and testimony established that he needed surgery, and he did it. So to say, well, I mean, when he saw it, he could put it in, but he still felt it justified surgery. And I would say that was true for the whole two and a half years that he had to live with this. So thank you, Your Honors, for consideration. All right. Thanks, and thanks to Mr. Hodling. We will take the case under advisement.